UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RODNEY E. THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 4997 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

In September 2011, Rodney Thompson filed a claim for disability insurance benefits with the Social Security Administration. Doc. 7-1 at 140-147. The Commissioner denied the claim, and then denied Thompson's request for reconsideration. *Id*. at 73-77, 81-84. Thompson sought and received a hearing before an administrative law judge ("ALJ") pursuant to 20 C.F.R. § 404.914. Doc. 7-1 at 79-80, 85-99. The ALJ denied the claim, *id*. at 33-41, and the Social Security Appeals Council denied Thompson's request for review of the ALJ's decision, *id*. at 7-10, making the ALJ's decision the final decision of the Commissioner. *See Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). Thompson timely sought judicial review pursuant to 42 U.S.C. § 405(g). Doc. 1. For the following reasons, Thompson's motion to reverse or remand (Doc. 15) is granted, the Commissioner's summary judgment motion (Doc. 16) is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

**Background**

The following facts are taken from the administrative record.

1

A.  **Factual Background**

Thompson, who was 53 years old in December 2012 (the date he was last insured), injured his left leg in a motorcycle accident in 2000. Doc. 7-1 at 37. A 2001 x-ray revealed either a healed fracture or a torus fracture—also known as a "buckle" fracture, which is an "incomplete fracture[] of the shaft of a long bone that is characterised by bulging of the cortex," Aditya Shetty *et al*., "Torus Fracture," *Radiopaedia*, http://radiopaedia.org/articles/torus-fracture-1 (visited June 3, 2015)—in that leg. Doc. 7-1 at 180. Thompson worked as a laborer and gravestone monument setter, which often required him to lift and move heavy gravestones. *Id*. at 40. He stopped working in 2007 because of back, hip, and knee pain. *Id*. at 52, 143.

Thompson applied for disability insurance benefits in September 2011. *Id*. at 140. On November 28, 2011, state agency physician Dilip Patel examined Thompson and found his musculoskeletal system largely "normal," except for some "mild synovial thickening" in the left knee and "slightly reduced range of movement" in the left knee and hip. Doc. 7-1 at 175-176. Thompson reported "mild pain" in his left knee, hip, and back, *id*. at 176, though he also claimed to be "[u]nable to walk more than [a] two block distance," *id*. at 174. Another state agency physician, upon reviewing Thompson's medical records, concluded in December 2011 that he could occasionally lift up to 50 pounds, frequently lift up to 25 pounds, and stand, walk, or sit (with normal breaks) up to 6 hours in an 8-hour workday. *Id*. at 203.

In May 2012, Thompson complained to Dr. Sherif Milik about lower back, hip, and leg pain. *Id*. at 37, 226. Dr. Milik remarked that Thompson appeared to be "in significant pain and distress," but did not note any objective evidence of a cause for these symptoms and sent him to the emergency room for x-rays. *Id*. at 227-228. At a June 4, 2012 follow-up appointment, Dr. Milik concluded that the x-rays "showed only mild degeneration in both hip joints," *id*. at 222, and he prescribed Flexeril to help relieve Thompson's pain, *id*. at 224.

**B.     The Administrative Hearing**

On January 10, 2013, Thompson, appearing with counsel, testified at an administrative hearing before the ALJ.  His testimony occupies a little less than five pages of the hearing transcript; here are the first two-and-a-half pages:

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q  Okay.  Where did you go to high school?

A  In Jacksonville, Arkansas.

Q  Jacksonville, Arkansas.  And you graduated in 1978, correct?

A  Yes, sir.

Q  Okay.  You worked as a laborer, is that correct?

A  Yes, sir.

Q  Okay.  And did you work for Gast Monuments?

A  Yes, sir.

Q  Yeah.  They're very famous for making … tombstones.

A  Yeah.

Q  Yeah.  They are.  So, where was the facility located that you worked at?

A  When I started it was on Clark.

Q  Oh.  Yeah.  Is that what—Clark, was that near Lawrence, where Rainbow Arena used to be.

A  Yes.  Yes.

Q  Yeah.  I used to ice skate over there in the early '60's.  That was back in 1962.  And, and Gast had a store there and I'll never forget they had one monument there.  It was called Attila the Hun.  And I used to stop and stare at it. It just fascinated me.  It was, like huge, about this big.  It was like a warrior or had a sword and everything.  (INAUDIBLE) it was called Attila the Hun. It was just so creatively done.  I wonder whoever—I wonder who bought that and put that on their grave, you know.  It was fascinating though, you know. Because, that's right across from—

A  St. Boniface.

3

Q —is that St. Boniface? St. Boniface.

A Yeah.

Q It's a Lutheran cemetery.

A Right.

Q Right across the street. Rainbow, of course, Rainbow Arena is gone.

A Gone.

Q And they, they have a condominium, I think, they put up there.

A Yeah.

Q I remember, I remember that place, back in those days, like 1961, '62, '63. Yeah. That's one of the—did you work right in that store?

A Yes. When I started working for them that's where I was at.

Q Okay. So, what, what did you do?

A I did some of the engraving, the design work on them and just generally moving them around and whatever—

Q Those things are heavy. And so, do they still make, like these interesting types of tombstones?

A Yes.

Q They still do that?

A Yes.

Q I mean, good. Because, you know, I mean, cemeteries could be some of the most fascinating places to visit. But, when all you see is, like ground level gravestones it looks so sterile and uninteresting. Then you go to a cemetery like Graceland, with their—

A Graceland. Yeah. All the big ones.

Q Or Rosehill, you know, and they have these great fabulous tombstones, it's just, you know—it takes like a place where you have, like a city (INAUDIBLE) it also becomes almost like an art museum at the same time.

A It is.

Q Yeah. So, you, you were all part of that.

>        A   Yes.
>
>        Q   So, it's interesting meeting you, Rodney. Thank you. Okay.

Doc. 7-1 at 49-52.

This exchange comprised about half of Thompson's testimony. Another full page of the transcript is spent establishing that Thompson lives in an apartment with his girlfriend in a western suburb of Chicago. *Id*. at 53-54. In the remaining page-and-a-half of testimony, Thompson said that he suffered unspecified injuries to his back and knee that he "kind of worked through" at first, but that degenerated so that he "could work a few weeks and then … had to be off a week, maybe a week and a half." *Id*. at 52. He had not worked in the previous five-and-a-half years. *Id*. at 52-53. Thompson said that he could walk only three blocks at a time before needing to rest, and that although "[m]ost of the time" he took Advil to alleviate his pain, he would on occasion "go to a free clinic somewhere and get something that's stronger [i]f it gets to where I can't stand it." *Id*. at 54.

Ronald Semerdjian, a medical expert who reviewed Thompson's medical records but did not examine him, testified that, for all Thompson's complaints about pain in his lower back, left knee, and left hip, "the imaging studies … show mild degenerative joint disease in … the hips and that's pretty much it." Doc. 7-1 at 57. Dr. Semerdjian reiterated that the "objective scientific evidence shows only minimal degenerative joint disease in the pelvis—in the—in both hips … which ordinarily is not a disabling thing, not at the minimal [level]." *Id*. at 58. Dr. Semerdjian opined that taking "NSAIDS [(nonsteroidal anti-inflammatory drugs)] on and off will probably usually control" Thompson's condition. *Ibid*. Based on Thompson's description of his symptoms, Dr. Semerdjian agreed that he had the residual functional capacity ("RFC") to perform "medium work," but said he would further limit Thompson to only occasionally bending, stooping, and crawling. *Ibid*.

5

Finally, a vocational expert ("VE") testified that Thompson's previous job required a combination of medium and heavy exertional work, *id*. at 62, leading the ALJ to conclude that Thompson could no longer perform his past relevant work, *id*. at 64. The VE did not estimate the number of jobs in the national economy that Thompson could perform.

The ALJ granted Thompson's counsel's request to hold the record open for two more weeks so that Thompson could submit a 2010 MRI of his spine. *Id*. at 66. Thompson never placed that MRI in the record.

### C. The Commissioner's Decision

On March 26, 2013, the ALJ issued a decision finding that Thompson was not disabled and was therefore ineligible for disability benefits. Doc. 7-1 at 33-41. The ALJ followed the "five-step sequential evaluation process" for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) (listing the steps); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (describing the steps). Only the fourth step, in which the ALJ "assesses an applicant's residual functional capacity (RFC)," is in dispute. *Weatherbee*, 649 F.3d at 569.

The ALJ found that Thompson's RFC limited him to "medium work," defined in 20 C.F.R. § 416.967(c) as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." Because Thompson was 53 years old on the date he was last insured and thus "closely approaching advanced age," 20 C.F.R. 404.1563(d), the ALJ found him "not disabled" pursuant to the Medical Vocational Rules, 20 C.F.R. pt. 404, subpt. P, app. 2, § 203.22; *see also id*. §§ 203.18-203.24 (directing a finding of "not disabled" for all individuals who are "closely approaching advanced age" and can perform "medium work"). Doc. 7-1 at 40.

6

**Discussion**

A claimant is disabled under the Social Security Act if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant has the burden of showing that his impairments prevent him from performing prior employment and any other job generally available in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). As noted, because the Social Security Appeals Council declined to review the ALJ's decision that Thompson was not disabled, the ALJ's decision became the Commissioner's final decision.

Section 405 of the Act authorizes judicial review of the Commissioner's final decision. *See* 42 U.S.C. § 405(g). The court reviews the Commissioner's legal determinations *de novo* and her factual findings deferentially, affirming those findings so long as they are supported by substantial evidence. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; it "must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (internal quotation marks omitted). If the reviewing court finds that the Commissioner's decision is not supported by substantial evidence, "a remand for further proceedings is [usually] the appropriate remedy." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). Moreover, the court "cannot uphold an administrative decision that fails to mention highly pertinent evidence," *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), or a decision containing errors of law, *see Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

In addition to satisfying these standards, the Commissioner's opinion must build an "accurate and logical bridge from the evidence to [the] conclusion so that [the] reviewing court[] may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (internal quotation marks omitted); *see Briscoe*, 425 F.3d at 351 ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (holding that the Commissioner must "articulate at some minimal level [his] analysis of the evidence to permit an informed review") (internal quotation marks omitted). To build a logical bridge, the Commissioner must "sufficiently articulate his assessment of the evidence to assure [the court] that he considered the important evidence and to enable [the court] to trace the path of his reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (internal quotation and alteration marks omitted). The court "cannot uphold a decision by an administrative agency … if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Thompson challenges the ALJ's RFC determination on several grounds, but one is dispositive: the ALJ did not adequately explain why he found only partially credible Thompson's reports of pain. Social Security regulations establish a two-step process for evaluating a claimant's pain: "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment … that could reasonably be expected to produce the individual's pain"; and second, "the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." S.S.R. 96-7p, 1996

WL 374186, at *2; *see Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) ("An ALJ must consider a claimant's subjective complaints of pain if the claimant has a medically determined impairment that could reasonably be expected to produce that pain."). The ALJ found that Thompson's "medically determinable impairment could reasonably be expected to cause the alleged symptoms," Doc. 7-1 at 37, so only the second step, his credibility finding, is at issue.

An ALJ's credibility determination is "entitled to special deference because the ALJ is in a better position than the reviewing court to observe a witness." *Briscoe*, 425 F.3d at 354. A reviewing court may "overturn a credibility determination only if it is patently wrong," *Craft*, 539 F.3d at 678, or if the ALJ fails to "justif[y] her conclusions with reasons that are supported by the record," *Richards v. Astrue*, 370 F. App'x 727, 731 (7th Cir. 2010) (per curiam); *see also Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (per curiam). To build the required logical bridge for a credibility determination, the ALJ must consider not only the objective medical evidence, but also the claimant's daily activity; the duration, frequency, and intensity of pain; any precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; and functional restrictions, among other factors. *See* S.S.R. 96-7p, 1996 WL 374186, at *3; *Villano*, 556 F.3d at 562-63 (requiring an analysis of the factors listed in S.S.R. 96-7p as part of building a logical bridge for credibility determinations). In particular, "[u]nder Social Security Ruling 96-7p, an ALJ's evaluation of a[n] applicant's credibility must be specific enough to make clear to [the court] how much weight the ALJ gave to the applicant's testimony and the reasons for that decision." *Hill v. Astrue*, 295 F. App'x 77, 81 (7th Cir. 2008) (per curiam).

The ALJ found Thompson's reports of pain not entirely credible because he "relieves his pain with Advil" and "has not taken any narcotic based pain relieving medications." Doc. 7-1 at

9

38. Yet Thompson testified that, when the pain gets bad despite his taking Advil, he also gets "something that's stronger" from a free clinic. The ALJ discounted this evidence because Thompson "only received Flexeril, a muscle relaxant. The fact that [he] is able to treat his pain with an over the counter pain medication suggests that his condition is not as disabling as he alleged." *Ibid.* Although Flexeril (generic name cyclobenzaprine) is indeed a muscle relaxant, it is not available "over the counter," but rather requires a prescription. *See* U.S. National Library of Medicine, "Cyclobenzaprine (By mouth)," *PubMed Health*, www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009767/?report=details (visited June 3, 2015) ("Cyclobenzaprine is available only with your doctor's prescription."). Furthermore, Flexeril may offer powerful relief for back pain, either by itself or when combined with a nonsteroidal anti-inflammatory drug like Advil (ibuprofen). *See* Maurits W. van Tulder, *et al.*, "Muscle Relaxants for Nonspecific Low Back Pain," 28 *Spine* 1978, 1989 (2003) (finding "strong evidence that combination [of muscle relaxants, including cyclobenzaprine] with analgesics or NSAIDs improved and accelerated recovery, but at the cost of increased central nervous system adverse effects"); Peter E. Toth & Jason Urtis, "Commonly Used Muscle Relaxant Therapies for Acute Low Back Pain," 26 *Clinical Therapeutics* 1355, 1355-67 (2004) (concluding that "[a]nalgesic pain management for low back pain due to muscle spasm may be combined with a muscle relaxant" to improve outcomes and that "[c]yclobenzaprine hydrochloride has the most recent and largest clinical trials demonstrating its benefit"); Martin K. Childers, *et al.*, "Low-Dose Cyclobenzaprine Versus Combination Therapy with Ibuprofen for Acute Neck or Back Pain with Muscle Spasm," 21 *Current Medical Research & Opinion* 1485, 1485-93 (2005) (concluding that "cyclobenzaprine 5 mg TID plus ibuprofen was not superior to cyclobenzaprine 5 mg TID alone in adult patients with acute neck and back pain with muscle spasm"). Besides incorrectly

stating that Flexeril can be obtained over the counter, the ALJ never explained why Thompson's taking Flexeril, possibly with Advil, "suggest[ed] that his condition is not as disabling as he alleged." Doc. 7-1 at 38. Absent such an explanation, the court cannot "meaningful[ly]" review the ALJ's conclusion. *Young*, 362 F.3d at 1002; *Hill*, 295 F. App'x at 81.

In addition, the ALJ faulted Thompson for "significant gaps in [his] history of treatment. … [T]he claimant *did not mention concerns such as cost or lack of insurance* as reasons why he did not seek medical treatment in the ten-year span from 2000 to 2011." *Id*. at 38-39 (emphasis added). This is incorrect as well: Thompson's pre-hearing memorandum to the ALJ specifically averred that his failure to seek care "is due to his dire financial circumstances and lack of adequate insurance coverage. … Therefore, we ask that you do not take his history of inconsistent past medical treatment as indicative of noncompliance or a lack of severity." *Id*. at 168 (citing cases holding that a claimant must not be penalized for an inability to pay for medical care). And Thompson's failure to mention his lack of insurance at the administrative hearing is understandable given that the ALJ never asked Thompson about the ten-year gap in treatment. Accordingly, on this record, that gap is not a valid reason to discount Thompson's credibility. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("[T]he ALJ merely asked [the claimant] why she had not sought treatment, and asked no further questions after she explained that she could not afford treatment after having lost her insurance. In short, the ALJ should not have rested his credibility determination on Roddy's failure to seek treatment after 2006, at least as supported in this record."); *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) ("[T]he ALJ was required by Social Security Rulings to consider explanations for instances where Myles did not keep up with her treatment, and he did not do so. … Inability to pay for medication or negative side effects from medication may excuse failure to pursue treatment.").

The ALJ's two stated reasons for his credibility determination having evaporated, the court is left with no bridge, let alone a logical one, to review. *See Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) ("We have repeatedly held that an ALJ must provide a logical bridge between the evidence in the record and her conclusion."); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (per cuiram) (stating that one of the "troubling features about the ALJ's assessment of Moss's credibility" was that "the ALJ's recitation of the administrative record is misleading or inaccurate on several significant points"). Given this disposition, there is no need to reach Thompson's other arguments for vacating the Commissioner's decision. *See Fox v. Astrue*, 2010 WL 1381662, at *6 (S.D. Ind. Mar. 30, 2010) ("[B]ecause on remand the ALJ will reconsider the mental health evidence and restrictions … that process is likely to also [a]ffect the ALJ's view of [the claimant's] overall credibility. Under these circumstances, the court cannot affirm the ALJ's credibility analysis."); *Hudson v. Astrue*, 2009 WL 2612528, at *14 n.6 (N.D. Ill. Aug. 24, 2009) ("In light of this remand order [to reassess an RFC determination], we find it unnecessary to address the other arguments that plaintiff has raised. On remand, the ALJ will be free to re-examine and reassess those points, including … his credibility decisions in determining plaintiff's RFC."). The court expresses no opinion either on those arguments' merits or on the ultimate question whether Thompson is disabled and entitled to benefits.

## Conclusion

For the foregoing reasons, Thompson's motion to reverse or remand is granted, the Commissioner's summary judgment motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

June 10, 2015

United States District Judge